PATRIC HOOPER (State Bar No. 57343)
BRIDGET A. GORDON (State Bar No. 287098)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181

Attorneys for Plaintiff Agendia, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| AGENDIA, INC.,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>ALEX AZAR, SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR JUDICIAL REVIEW OF AGENCY DECISION**<br><br>Trial Date:　　None Set |

## JURISDICTION AND VENUE

1.　　This Court has jurisdiction to review the Medicare agency actions in this matter pursuant to 42 U.S.C. sections 1395ff(b)(2)(C)(i)(II) and (ii)(II), because the review entity, the Medicare Appeals Council, has failed to rule on the requests for expedited access to judicial review within the 60-day period allowed by law. Jurisdiction also exists, if necessary, under 28 U.S.C. sections 1331 and 1361 to resolve the important federal constitutional questions raised by this action and to compel the defendant Secretary of Health and Human Services ("Secretary") to comply with the mandatory duties owed plaintiff.

2.　　Venue is appropriate in this judicial district under 42 U.S.C. section 1395ff(b)(2)(C)(iii), because plaintiff Agendia, Inc. ("Agendia") does business

within this judicial district, Irvine, California.

## OVERVIEW

3. It is difficult to overstate the importance of the role of Congress and the Secretary in establishing sound and reasonable policies for administering the Medicare program. This is especially true for policies for determining whether Medicare should "cover," and thus pay for, advances in medicine, such as molecular diagnostic testing that provide doctors treating cancer patients with information to help guide their ongoing treatment of such patients through more precise medical procedures. As explained further below, such clinical laboratory testing helps to assure personalized medical decision making by those doctors treating individual Medicare beneficiaries, as opposed to following much less precise, one-size-fits-all protocols.

4. Under the Constitution, public policymaking, including discretionary regulatory decisions governing Medicare coverage, must be made by **Congress,** in the first instance, and implemented by federal **government** agency officials through the appropriate **governmental** policymaking procedures to assure accountability, fairness and uniformity. Unfortunately, however, such **governmental** policy making is no longer being used to determine Medicare coverage for molecular diagnostic laboratory testing. Instead, Congress and the Secretary have shirked their responsibility by delegating such important discretionary regulatory policymaking to private contractors, typically private insurance companies, who are not accountable to the public. And, these private contractors, known as Medicare Administrative Contractors ("MACs"), use their own sub-regulatory procedures to establish Medicare coverage policy. This *ultra vires* practice explains perhaps, but certainly does not justify, the use of the resulting arbitrary MAC policies in matters such as the present case where three different administrative law judges of the Secretary reached three different and contrary decisions based on applying the same MAC policy to the very same circumstances.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

5. The particular private contractor policy at issue here is embodied in a Medicare local coverage determination ("LCD") that mechanically disallows Medicare coverage throughout the Country for any molecular diagnostic test ordered by a patient's treating physician, unless the test has been approved by a sub-regulatory assessment process for molecular diagnostic services administered by a private contractor, known as "MolDx." MolDx was established in August 2013, on an *ad hoc* basis, by a single MAC located in South Carolina, Palmetto GBA. Yet, its reach continues to apply throughout the Country, as evidenced by the two decisions in this case, which apply to testing of Medicare patients located throughout the Country.

6. Agendia and the outside, independent doctors who order Agendia's testing for their breast cancer patients continue to be adversely affected by the MACs' sub-regulatory policy making as evidenced by the two decisions of the Secretary for which expedited judicial review has been requested. Through this action, Agendia challenges (a) the authority of Congress and the Secretary to delegate to private contractors **discretionary**, regulatory policy making, and specifically their authority to do so through LCDs and the MolDx process, and (b) the fact that the Secretary requires his governmental adjudicators to give deference to the policies established by private contractors.

## THE PARTIES

7. Agendia is a Medicare approved and state licensed clinical laboratory located in Irvine, California. It furnishes advanced diagnostic laboratory testing ordered by physicians for their patients throughout the United States. Such advanced diagnostic testing is defined by Medicare as laboratory testing offered and furnished only by a single laboratory and not sold for use by a laboratory other than the original developing laboratory. Such testing consists of an analysis of multiple biomarkers of DNA, RNA, or proteins combined with a unique algorithm to yield a single patient-specific result. 42 U.S.C. § 1395m-1(d)(5). The two laboratory tests

3
COMPLAINT FOR JUDICIAL REVIEW OF AGENCY DECISION

at issue, BluePrint and TargetPrint, were developed by Agendia using genetic research made possible by the Human Genome Project (1990-2003), an international scientific research project designed to determine the sequence of nucleotide base pairs that make up human DNA, and identifying and mapping all of the genes of the human genome from both a physical and a functional standpoint.

8. The Secretary is responsible for administering the Medicare program, the federal health insurance program for the aged and disabled. 42 U.S.C. §§ 1395 *et seq*. The Centers for Medicare and Medicaid Services ("CMS") is the federal agency responsible for the day-by-day administration of the Medicare program. Physician and laboratory services are medical services covered by Part B of the Medicare program. 42 U.S.C. §§ 1395j *et seq*, including 42 U.S.C. § 1395x(s)(3), establishing coverage for diagnostic laboratory services.

## THE RELEVANT MEDICARE PROVISIONS

9. Under 42 U.S.C. section 1395u(a), the administration of Part B "shall be conducted through contracts with medicare (*sic*) administrative contractors under section 1395kk-1 of this title." Section 1395kk-1(a)(4), in turn, expressly includes "developing" LCDs as one of the MACs' delegated functions.

10. An LCD is "a determination by a fiscal intermediary or a carrier [now known as a MAC] . . . under Part B . . .respecting whether or not a particular item or service is covered . . in accordance with section 1395y(a)(1)(A) of this title." Section 1395y(a)(1)(A), in turn, provides that no Medicare payment may be made for any expenses incurred for items and services that are not "reasonable and necessary" for the diagnosis or treatment of illnesses or injury or to improve the functioning of a malformed body member. Thus, this statutory provision essentially requires Medicare to cover and pay for services determined to be reasonable and necessary to the diagnosis or treatment of an illness unless some other express provision of the law or duly enacted regulation provides otherwise. The Secretary has promulgated regulations implementing this provision, including 42 C.F.R.

section 411.15(k) and 42 C.F.R. section 410.32(a) that disallows coverage for laboratory services unless they are ordered by a patient's treating physician for the management of the patient's condition.

11. While Congress has authorized MACs to develop Medicare coverage policy through the issuance of LCDs without specifying the process to be followed in doing so, it requires the Secretary to issue National Coverage Determinations ("NCDs") through a governmental process that is similar to the process required to enact regulations under the rulemaking requirements of the federal Administrative Procedure Act, 5 U.S.C. section 553 ("APA").  *See* 42 U.S.C. § 1395y(*l*)(3).  As a result, NCDs are not subject to APA rulemaking provisions.  However, all other Medicare statements of policies and rules that establish or change a substantive legal standard governing the scope of Medicare benefits, presumably including LCDs, must be enacted as a regulation under the APA in accordance with 42 U.S.C. section 1395hh(a)(2).  Yet, MACs do not issue LCDs in accordance with such APA rulemaking processes.

12. Disputes over the issue of whether particular items or services are reasonable and necessary for the treatment of an illness are commonplace.  In fact, Congress has established an elaborate administrative appeal process to resolve such disputes.  Under 42 U.S.C. sections 1395ff(a) and (b), MACs make "initial determinations" and "redeterminations" concerning whether services for which Medicare claims for payment are submitted by clinical laboratories and other kinds of Medicare providers and suppliers are reasonable and necessary and thus Medicare covered and payable.

13. Under 42 U.S.C. section 1395ff(b), Laboratories may request reconsideration of such "claims determinations" by another private contractor, known as a qualified independent contractor ("QIC").  Thereafter, a laboratory or other provider or supplier of services may request an administrative hearing before one of the Secretary's administrative law judges ("ALJs").  The final step in the

administrative appeal process for Medicare claims is before the Medicare Appeals Council ("Council"), which may grant expedited access to judicial review under 42 U.S.C. section 1395ff(b)(2)(A) of questions of law or regulation.  The Council must rule on a request for expedited access to judicial review within 60 days.  If the Council fails to do so, the laboratory may file for judicial review.  42 U.S.C. § 1395ff(c), which is the case here.

14. The Secretary has established regulations implementing these administrative appeal procedures.  42 C.F.R. §§ 405.900 – 405.1140.  While ALJs and the Council are not bound by LCDs in adjudicating Medicare claims appeals, they must give "substantial deference" to LCDs, and if they choose not to follow an LCD, they must explain why they did not do so."  Moreover, the ALJs and the Council may not set aside or review the validity of an LCD for purposes of Medicare claims appeals such as those here.  42 C.F.R. § 405.1062.  Congress allows Medicare beneficiaries, but not Medicare providers or suppliers, including laboratories, to challenge the validity of LCDs.  42 U.S.C. §§ 1395ff(f)(2) and (f)(5).

## BACKGROUND FACTS

15. In each of the hundreds of individual patient cases at issue, the medical records presented to the ALJs show (a) that each patient was diagnosed with early stage breast cancer, (b) that her physician ordered the molecular diagnostic testing at issue, BluePrint and TargetPrint, for the management of the patient's condition, and (c) that the testing was provided as billed.  Such record evidence further shows that the testing results corroborated, supplemented, or contrasted the information in the patient's pathology report, and could be used to guide the physician in plotting the patient's most appropriate course of treatment.  With basal type cancer of the breast, the risk of distant metastasis is the highest of all breast cancer subtypes and once a metastatic event occurs, the cancer becomes incurable.  Therefore, accurately identifying the type of cancer at the earliest stages is crucial.  For example, standard

pathology procedures did not accurately identify the type of cancer in some cases in the records.  For example, by identifying a BluePrint basal type cancer case that has been identified as estrogen positive (luminal) by standard pathology, the high toxicity of the most powerful chemotherapy was justified by the likelihood of its effectiveness.  In other types of cases, the cancer patient might be spared the risks and the side effects of undergoing chemotherapy when the cancer cells are hormone driven inasmuch as the chemotherapy would not be effective and hormone therapy would be most effective.  Peer reviewed medical literature in the record shows that during the time at issue the tests were not investigational or experimental, but were used to guide treatment by oncologists as a standard practice in early stage breast cancer at the time the services at issue were provided.

16.     In 2012-2013, Agendia provided BluePrint and TargetPrint testing for hundreds of Medicare beneficiaries suffering from breast cancer at the request of the patients' treating physicians.  Agendia timely submitted claims for Medicare payment for these laboratory tests to Noridian Healthcare Solutions, LLC. ("Noridian"), Agendia's MAC.  Noridian denied payment for the testing based on an LCD that had been issued by Palmetto, a different MAC, in 2012, LCD L32288 (orig. det. eff. date May 2012)(now superseded).  Among other things, this LCD states that this "policy" confirms "non-coverage" for all molecular diagnostic tests that are not explicitly covered by an NCD, an LCD, a coverage article published by Palmetto GBA and excluded per MolDx Exempt Tests published on the Palmetto GBA website.  The MolDx assessment found there to be insufficient evidence to support reasonable and necessary criteria for Medicare reimbursement and thus deemed the BluePrint test to be a "statutorily excluded test" and neither test was on the LCD's list of covered services.  Noridian denied Agendia's requests for favorable redetermination for this same reason.

17.     Agendia timely requested the QIC (the private contractor responsible for reconsidering redeterminations) to order coverage and payment for the testing at

issue. As is customary for requests involving multiple claims, Agendia grouped the claims into three separate batches. Relying on LCD L32288 and the lack of approval by MolDx, the QIC denied reconsideration.

18. Agendia then timely requested ALJ hearings for each of the three denials of reconsideration. Due to a large backlog of cases, the Secretary's Office of Medicare Hearings and appeals did not schedule ALJ hearings on the three separate appeals until 2018, several years after Agendia filed its requests for ALJ hearings.

## THE AUGUST 22, 2018 ALJ DECISION ("ALJ I")

19. The first ALJ to consider any of Agendia's claims at a live (by telephone), *de novo* hearing, issued a decision, "ALJ I," on August 22, 2018, involving claims for 86 Medicare patients that was "fully favorable" to Agendia. During the hearing, Agendia presented expert testimony from a physician who had been in the private practice of oncology for 30 years, including at Cedars Sinai Medical Center in Los Angeles, regarding the testing at issue and the medical necessity of the same. The record evidence also contained documentation of each treating physicians' orders for the testing and pathology reports describing the breast cancer patients' conditions, as well as the individualized molecular diagnostic test results for each patient. Additionally, the hearing record included evidence-based scientific articles in effect during the dates of services at issue, which showed that BluePrint and TargetPrint were "more accurate than conventional pathology methods in determining the receptor status and response to treatment in early-stage breast cancer patients," a fact ignored by a subsequent ALJ due to her deference to LCD L32288, as pointed out below.

20. Based on this evidence, the ALJ in ALJ I found that prior to the growth of genetic technology, the medical community was aware that there were three types of breast cancer, all of which were treated by chemotherapy. However, with the growth in genetic technology, tests were developed to be more precise in identifying the type or classification of the individual's cancer, and accordingly, more precise in

1  how to effectively treat an individual's particular cancer.  Prior to such
2  developments, there was a 1 in 5 error rate in identifying the type of cancer a patient
3  had.  In 2012, both BluePrint and TargetPrint were used in conjunction to help a
4  physician plan a patient's course of treatment.  Because there were many gray areas
5  in standard pathology reports, these two tests furnished more precise information
6  that supplemented the pathology reports so that the treating physician could better
7  decide the course of treatment for each particular patient.  By 2012, the use of these
8  tests was the standard of care for oncologists.  Through the use of three
9  representative patient cases, Agendia's medical expert described in detail the
10 medical necessity of the testing for each patient.  The ALJ then applied this
11 reasoning to the evidence in the record for each of the remaining 83 patients.

12      21.    Based on these findings, the ALJ in the ALJ-I decision concluded that
13 the "emerging genetic testing provided to the beneficiaries in these cases were
14 medically reasonable and necessary."  The ALJ did not ignore the LCD or the
15 MolDx determinations but concluded that the tests at issue were reasonable and
16 necessary for treating the patients' conditions despite such MAC "policies."

17      22.    On October 10, 2018, the QIC requested the Council to review the
18 ALJ's August 22, 2018 decision on the primary ground that the ALJ erred as a
19 matter of law by "misapplying" LCD L3228 and the MolDx determination.
20 Agendia duly opposed that request and the Council has yet to address the QIC's
21 request.

22           **THE OCTOBER 12, 2018 ALJ DECISION ("ALJ II")**

23      23.    A second ALJ hearing involving claims for more than 200 Medicare
24 beneficiaries was held before a different ALJ on July 25, 2018.  On October 12,
25 2018, this second ALJ issued a decision that was "partially favorable" to Agendia.
26 During the telephone hearing in ALJ II, Agendia presented the very same type of
27 evidence it had presented at the hearing in ALJ I.  However, rather than ruling
28 favorably for Agendia for all of the beneficiaries, this second ALJ ruled favorably

for Agendia on only four patient cases – the four cases that Agendia's medical expert used as representative cases for all of the beneficiaries in ALJ II.

24. In ALJ II, the ALJ gave "substantial deference" to LCD L32288 for all of the patients (more than 200) except for the four cases discussed as representative cases by Agendia's expert (and seven other patients whose cases were not considered for procedural reasons). In doing so, the ALJ relied on testimony by a QIC physician representative who, in turn, relied on the LCD and MolDx policies. The second ALJ found "no compelling reason(s) not to defer to the LCD." Yet, the ALJ chose not to defer to the LCD for the four representative patients discussed by Agendia's expert at the hearing. For these four patients, the ALJ found the testing to be reasonable and necessary and thus covered and payable by Medicare.

25. On November 6, 2018, Agendia electronically filed with the Council a request for expedited access to judicial review for the claims denied by the ALJ in ALJ II pursuant to 42 U.S.C. section 1395ff(b)(2)(C), because there are no material issues of fact in dispute and Agendia was requesting judicial review of the issue of whether Congress' delegation of Medicare policy-making discretionary responsibility to the MACs with respect to LCD L32288 is constitutional and otherwise in accordance with the law. The Council lacks authority to decide this constitutional issue and the related legal issues of whether any deference is owing LDCs and whether LCDs are required to be enacted as regulations to be valid.

26. The Council failed to respond to Agendia's request within the 60-day period allowed by the controlling statute, 42 U.S.C. section 1395ff(b)(2)(C). In the meantime, by letter dated December 6, 2018, the QIC asked the Council to review that part of the ALJ II that was favorable to Agendia. The Council has not addressed this request.

### THE OCTOBER 30, 2018 ALJ DECISION ("ALJ III")

27. A third ALJ held a hearing on 181 patient claims on September 12, 2018. The third ALJ issued a decision on October 30, 2018 that was completely

unfavorable to Agendia. Once again, Agendia had presented the same type of evidence during the live hearing in this third ALJ case, ALJ III.

28. The third ALJ deferred fully to LCD L32288 and the MolDx process finding and concluding that the testing "did not comply with the LCD L32288." This ALJ also found that the testing is more expensive than the "standardized methods," the very same methods that the ALJ in ALJ I found to be reasonably and necessarily supplemented by TargetPrint and BluePrint. In her 132 page decision, the third ALJ repeated her analysis verbatim for nearly all of the 181 patients, thus treating all 131 patients the same.

29. On November 6, 2018, Agendia electronically filed a request for expedited access to judicial review of the decision in ALJ III on the same grounds it requested such review for the decision in ALJ II.

30. The Council failed to respond to Agendia's request within the 60-day period allowed by the controlling statute, 42 U.S.C. section 1395ff(b)(2)(C).

## THE DECISIONS IN ALJ II AND ALJ III ARE INVALID

31. The decisions in ALJ II and III are reviewable by this Court now because the Council did not respond timely to Agendia's request for expedited access to judicial review. Such review is governed by the provisions of the APA, specifically 5 U.S.C. section 706. Under Section 706, a decision of an agency must be set aside if it is (a) arbitrary or capricious and not in accordance with the law, (b) contrary to constitutional right or power, (c) in excess of statutory jurisdiction and other legal limits, or (d) without the procedure required by law.

32. The decisions in ALJ II and ALJ III are contrary to the fundamental constitutional principle requiring Congress to make laws and policies. All legislative powers are vested in Congress under Article 1, section 1 of the Constitution. While the details of such policymaking may be delegated to Executive Branch agencies under the appropriate circumstances, especially with respect to highly regulated industries, Congress may not delegate discretionary regulatory

policymaking to **private contractors** under any circumstances. And, even if Congress could constitutionally allow an agency to delegate such authority to a private contractor, there is no authority allowing Congress or the government agency to require judicial or quasi-judicial decision makers to give the policies developed by private contractors any deference of any degree. Thus, because Congress has authorized MACs to make Medicare coverage policies such as LCD L32288 and the MolDx process, and because the Secretary's regulations require ALJs to give substantial deference to these policies, which has actually occurred in the decisions in ALJ II and ALJ III, these decisions must be set aside. Furthermore, the Secretary must be ordered to comply with the Constitutional provisions at issue.

33. The decisions in ALJ II and ALJ III are also contrary to the procedures required by statute to be applicable to the promulgation of Medicare policies under the rulemaking provisions of the APA. Under established case law regarding the APA, as well as under the provisions of 42 U.S.C. section 1395hh, no Medicare policy or rule made be implemented unless it was enacted as a regulations which requires compliance with APA rulemaking requirements. LCD L32288 and the MolDx program were developed by a MAC, Palmetto GBA, without compliance with such rulemaking requirements and continue to be applied and enforced by MACs throughout the Country, including the MAC (Noridian) that disallowed payment for the claims at issue in the decisions in ALJ II and ALJ III.

34. Making the constitutional and other legal infirmities even more egregious under the circumstances of this case is the fact that Agendia has been required to follow the only process permitted by the Secretary's regulations to challenge the application of LCD L32288 and the MolDx program, which process has been inexcusably and prejudicially delayed for years thus depriving Agendia and the Medicare beneficiaries they serve of the full and unencumbered benefits of the critically important testing at issue on a reasonably prompt basis. Moreover, while Congress has required the Secretary to evaluate and determine which LCDs

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

5728090.1

should be adopted nationally and "to what extent greater consistency can be achieved among" LCDs under 42 U.S.C. section 1395y(*l*)(5)(A), Agendia is informed and believes and therefore alleges that the Secretary has either not performed such an evaluation or determination, or if he has done so, has not done so fully and fairly. For example, for nearly seven years, one MAC's policies, that of Palmetto GBA, have dominated Medicare policymaking for the coverage of diagnostic molecular testing and have effectively become a *de facto* NCD (National Coverage Determination) without going through the process required for the Secretary to enact such national Medicare coverage determinations.

## PRAYER

Wherefore, Agendia prays as follows:

1. For an order from this Court setting aside the decisions of the Secretary in ALJ II and ALJ III and requiring the Secretary to cover and pay for the claims at issue as well as all other similar past, present and future claims of Agendia;

2. For an order awarding Agendia its costs of suit including reasonable attorney's fees; and

3. For such other and further relief as this Court deems necessary and appropriate.

Dated: January 7, 2019          HOOPER, LUNDY & BOOKMAN, P.C.

By: _____
PATRIC HOOPER
Attorneys for Plaintiff Agendia, Inc.